**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

EDUARDO TAPIA,                   :
                                 :    Civil Action No. 12-4725 (FLW)
            Petitioner,          :
                                 :
            v.                   :    **OPINION**
                                 :
BEVERLY HASTINGS, et al.,        :
                                 :
            Respondents.         :


**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>
Eduardo Tapia
East Jersey State Prison
Rahway, NJ 07065


**WOLFSON**, District Judge

    Petitioner Eduardo Tapia, a prisoner currently confined at

East Jersey State Prison in Rahway, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254[1] challenging his conviction for kidnapping.  The

Respondents are Beverly Hastings and the Attorney General of the

State of New Jersey.

_____

    [1] Section 2254 provides in relevant part:

    (a) The Supreme Court, a Justice thereof, a circuit
    judge, or a district court shall entertain an
    application for a writ of habeas corpus in behalf of a
    person in custody pursuant to the judgment of a State
    court only on the ground that he is in custody in
    violation of the Constitution or laws or treaties of
    the United States.

Notice has been given pursuant to <u>Mason v. Meyers</u>, 208 F.3d 414 (3d Cir. 2000) and Petitioner has responded that he desires for this Court to rule upon the Petition as filed.  Because it appears from a review of the Petition and its attachments that the Petition is time-barred, Petitioner will be ordered to show cause why the Petition should not be dismissed with prejudice. <u>See</u> 28 U.S.C. § 2243.

## I.   BACKGROUND

The relevant facts underlying Petitioner's conviction are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[2]

> On February 14, 2002, at approximately 11:29 a.m., Juan Cordero received a telephone call from a woman identifying herself as the best friend of his former girlfriend, Leticia Hernandez.  She stated that Leticia was crying and wanted to see him.  Leticia and Cordero originally met while they were working at Dunkin' Donuts in Freehold in October 2001.  At the time, Leticia and Eduardo [Tapia] had lived together for almost ten years, had two children together, but never married.  Despite her relationship with Eduardo, Leticia and Cordero formed a romantic relationship that ended on January 17, 2002, when Leticia became pregnant.  Leticia informed Cordero that she did not want the child and did not want to see him anymore.

> Cordero agreed to meet the woman placing the phone call in hopes that Leticia had changed her mind.  The

---

[2] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

2

woman who called Cordero was Maria Tapia, Eduardo and [co-defendant] Rogelio's sister.  Maria made the call at Eduardo's request.  Eduardo gave Maria the keys to Leticia's white Chevy pick-up truck and Cordero's telephone number.  He instructed Maria to pick up Cordero and drive to an area behind a pizzeria in Howell, NJ.  Eduardo told Maria that he would meet her and Cordero in the parking lot behind the pizzeria because he wanted to confront the man with whom Leticia was having an affair.  Maria informed Cordero that she would pick him up at the Shop Rite Liquor Store in Freehold at noon and that she would be driving Leticia's white truck.

Cordero walked to the liquor store where he recognized Leticia's truck and walked over to the driver's side door.  Maria asked if he was Juan and he replied that he was.  Cordero then got into the vehicle and Maria drove to the parking lot behind the pizzeria. Cordero had no prior knowledge of the relationship between Eduardo and Leticia.

When Maria reached the parking lot, the white Chevy was cut off by a black sports utility vehicle (SUV) owned and driven by Rogelio.  Maria noticed that Eduardo, Rogelio, [brother] Miguel, and Rogelio's wife, Juliana, were all inside the black SUV.  According to Cordero, Eduardo and Rogelio exited the SUV and walked over to the passenger side door of Leticia's truck. Rogelio pulled Cordero out of the vehicle by his shoulders saying in Spanish to Cordero, "come out you motherfucker, [we] want to talk to you."  Miguel then exited the black SUV.

Cordero testified initially that Rogelio, who he identified at trial as the person in the blue shirt, had a knife in his hand.  He related that Rogelio and Miguel crowded around him saying, "Don't worry," and "Nothing wrong."  Rogelio, however, then took the knife and placed it very close to Cordero's chest.  Cordero struggled with Rogelio and found himself fighting with all three men.  Cordero claimed that he made several pleas for someone to help and to call the police. After identifying the switchblade knife, which had been marked as an exhibit, Cordero then testified that it was Eduardo who had the knife and threatened him by placing the knife close to his chest.  After the lunch recess, Cordero corrected himself, stating that he was

mistaken because the defendants' weight had changed, and reiterated that his initial identification of Rogelio as the person with the knife was correct and Eduardo was the person who opened the door of the white truck.

Eduardo, Rogelio, and Miguel then tied Cordero's hands behind his back with a wire and threw him on the floor of the black SUV. During the course of the struggle, Cordero lost his hat and watch. Eduardo, Rogelio, and Miguel then entered the vehicle and drove away. One of them kept a foot on Cordero's neck so that he could not move. A short time later, Cordero heard a female voice ask about the location of the knife and instructed whoever had it to throw it away. Eventually, the SUV stopped at Eduardo's residence at 137 Roosevelt Avenue in Howell Township and Cordero was pulled out of the vehicle and thrown to the ground. One of Cordero's hands became free from the wire restraint. Rogelio picked Cordero up from the ground and held Cordero's free hand behind his back.

Leticia's sister, Maria Hernandez, was sitting in Eduardo's kitchen when the group arrived. According to both Cordero and Maria Hernandez, Miguel stood behind Cordero holding a long stick or metal tube, Rogelio held one of Cordero's arms behind his back and Eduardo held Cordero's other hand which had a wire around it. After being escorted into the kitchen, Eduardo began poking Cordero's face and talking to him in a menacing way, saying, "do you know who we are? I am big man. I don't feel afraid about anything. Now, you have a very bad problem[] ... you piece of shit because this girl, she's garbage like you and I know everything from your relation[ship]." Maria Hernandez, who witnessed Eduardo's threats and verbal abuse of Cordero, stated that her sister Leticia was scared and crying. Eduardo addressed Leticia and Hernandez, saying that they knew Cordero and Leticia lived together. Then Maria Tapia began to insult Maria Hernandez. Someone then announced that the police had arrived, at which point Eduardo told his sister to "say what I told you."

Rogelio's version of this sequence of events was somewhat different. According to Rogelio, he and his wife had been invited to Eduardo's. After they arrived, Eduardo approached his vehicle and asked Rogelio to take him to the store to buy a part for his

bathroom.  Shortly thereafter, Eduardo, Rogelio,
Miguel, and Juliana Cohetero got into Rogelio's SUV and
drove off.  Eduardo directed Rogelio to the Shop Rite
and instructed him to pull his vehicle into the parking
lot near te pizzeria.  Eduardo told Rogelio that he was
waiting to talk with someone [Cordero] regarding that
person's involvement with his wife.  According to
Rogelio, Eduardo only wanted to talk with Cordero and
asked Cordero to come back to his house.

    Rogelio denied that anyone pulled Cordero from
Leticia's pickup truck.  Instead, he stated that after
his sister and Cordero arrived, Cordero voluntarily
exited the pickup.  A struggle then ensued between
Cordero and Eduardo.  He stated that after Eduardo
approached the pickup, Cordero exited and began to
swing an opened switchblade knife at Eduardo.  Rogelio
then attempted to help Eduardo by subduing Cordero, at
which time Rogelio was cut by Cordero's knife.  Miguel
then exited the black SUV to assist in taking the knife
from Cordero.

    According to Rogelio, Cordero threw the knife
inside the black SUV and then leaped into the vehicle
to seize it.  Rogelio was able to retrieve the knife
forcibly from Cordero.  He then gave the knife to
Miguel "to throw it out the window so nobody else would
be hurt."  After Rogelio, Miguel, and Eduardo re-
entered the SUV, Rogelio's wife drove them all back to
Eduardo's house.  Once they arrived, Rogelio claimed
everyone entered the house voluntarily, including
Cordero.  They all went straight to the kitchen where
Eduardo asked Cordero in a normal non-threatening voice
if Cordero loved Leticia and told Cordero that he could
take her but not the children.  Rogelio denied that
Cordero's hands were held behind his back, that they
had ever been tied with wire, or that Cordero was ever
verbally or physically threatened.

    Several people in the shopping plaza witnessed the
incident.  The police received three 911 telephone
calls between 12:21 p.m. and 12:33 p.m.  Maria and Tony
Bojku, the owners of a pizzeria located in the shopping
plaza, told police they saw several Hispanic men grab
another man, throw him into a black SUV and take off.
When asked whether thy recalled telling the
investigating police officer that they observed that
the attackers had a knife, both Maria and Tony

responded that they did not remember.  Jay Moon, the owner of a flower shop in the plaza, also called 911 and told police that he witnessed a man being beaten by three other individuals between a white pickup truck and a black SUV.  He also stated that he saw the three attackers open the door to the black SUV and try to push the other man inside.

Howell Township Patrolman John Lopez was dispatched to the shopping center and arrived at 12:26 p.m.  When he arrived, Lopez spoke with Tony Bojku who told him what he had seen and that a knife was involved.  Lopez then advised dispatch to put out a report that three to four Hispanic males had forced another Hispanic male into a black Chevy Blazer with a knife.  Shortly thereafter, Detective Paul Hendershot arrived at the scene and he and Lopez found Corder's hat and watch.  They also noticed a Geo Prism parked in the lot with the keys still inside.  After calling headquarters, Lopez learned that the registered owner of the Geo Prism resided at 137 Roosevelt Avenue in Howell Township, which information they relayed to headquarters.  Lopez, Hendershot, and several other officers went to 137 Roosevelt Avenue, after which twelve individuals exited the residence.

After being arrested, Miguel offered to show one of the arresting officers where the knife that was involved in the incident was located.  The switchblade knife, later identified by Cordero, was found near the parking lot adjacent to the pizzeria.  Another officer, Patrolman Robert Ortenzi, transported Eduardo and Miguel to headquarters.  When they arrived, Eduardo complained that his handcuffs were too tight.  Ortenzi exited the vehicle, walked to the rear, opened the passenger door to check Eduardo's handcuffs, and heard the sound of metal striking the pavement.  Looking down, he saw and retrieved wire that had been looped together.

(Petition, Ex., Opinion, Superior Court of New Jersey, Appellate

Division at 4-11 (June 9, 2005).)

Following a jury trial in the Superior Court of New Jersey,

Law Division, Monmouth County, Petitioner was convicted of

second-degree conspiracy to commit kidnapping, in violation of N.J.S.A. 2C:5-2 and N.J.S.A. 2C:13-1, first-degree kidnapping, in violation of N.J.S.A. 2C:13-1(b), third-degree possession of a weapon (switchblade) for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(d), and fourth-degree possession of a prohibited weapon (switchblade), in violation of N.J.S.A. 2C:39-3(e).

The trial court sentenced Petitioner to an aggregate sentence of sixteen years subject to an 85% parole disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On direct appeal, the Superior Court of New Jersey, Appellate Division, affirmed the conviction and sentence.[3]  The Supreme Court of New Jersey denied certification on October 7, 2005.  State v. Tapia, 185 N.J. 295 (2005).  Petitioner did not seek a writ of certiorari from the Supreme Court of the United States.

Petitioner filed his first state petition for post-conviction relief on January 6, 2006.  In an oral opinion placed on the record on January 26, 2007, the trial court denied relief.  The Appellate Division affirmed the denial of relief, State v. Tapia, 2009 WL 112726 (N.J. Super. App.Div. Jan. 20, 2009), and

---

[3] On direct appeal, Petitioner asserted the following grounds for relief: (1) ineffective assistance of trial counsel, (2) insufficient evidence to sustain the convictions, (3) excessive sentence.

on May 8, 2009, the Supreme Court of New Jersey denied certification.  State v. Tapia, 199 N.J. 516 (2009).[4]

Petitioner filed his second state petition for post-conviction relief on June 15, 2009.[5]  The trial court found the second PCR petition time barred, pursuant to the five-year limit of Rule 3:22-12 of the New Jersey Court Rules, procedurally barred, pursuant to Rules 3:22-4 and 3:22-5, and meritless.  The Appellate Division affirmed on the same grounds.

> Post-conviction relief constitutes "New Jersey's analogue to the federal writ of habeas corpus."  State v. Preciose, 129 N.J. 451, 459 (1992). ...

> To protect against courts addressing endless issues in a piecemeal fashion, certain procedural rules govern PCR petition filings.  For example, Rule 3:22-12(a) imposes a five-year limitation on filing a petition after the judgment sought to be attacked.  Although the time limitations are not absolute and may be waived to prevent a fundamental injustice, the rule must be viewed in light of its dual purpose to ensure that the passage of time does not prejudice the State's retrial of a defendant and to respect the need for achieving finality.  State v. DiFrisco, 187 N.J. 156, 166-67 (2006). ...

---

[4] In his first state PCR petition, Petitioner raised and exhausted claims related to the ineffective assistance of trial and appellate counsel, including the failure to object to an allegedly improper summation by the prosecutor.  Certain claims raised for the first time on appeal were not considered by the Appellate Division.

[5] In his second state PCR petition, Petitioner raised claims of ineffective assistance of trial and appellate counsel, including the failure to request a hearing regarding the admissibility of his statements under Miranda v. Arizona, 384 U.S. 436 (1966), the failure to investigate and call witnesses, and the failure to object to jury instructions.

We are satisfied that defendant's PCR petition, filed six years after the judgment of conviction without any claim of excusable neglect, is clearly time-barred.  R. 3:22-12.

State v. Tapia, 2012 WL 163125, *3 (N.J. Super. App.Div. Jan. 20, 2012).  The Supreme Court of New Jersey denied certification on June 21, 2012.  State v. Tapia, 210 N.J. 480 (2012).

This Petition, dated July 5, 2012, followed.[6]  Here, Petitioner asserts that he was denied his constitutional right to effective assistance of counsel because his trial counsel failed to request a Miranda hearing to test the voluntariness of Petitioner's statements and failed to call any witnesses.

## II.   STANDARDS FOR A SUA SPONTE DISMISSAL

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

United States Code Title 28, Section 2243 provides in relevant part as follows:

---

[6] "[A] pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court."  Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)).

A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

Thus, "Federal courts are authorized to dismiss summarily any habeas petition that appears legally insufficient on its face." McFarland v. Scott, 512 U.S. 849, 856 (1994). See also Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts ("If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition ... ." (emphasis added)).

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970). Nevertheless, a federal district court can dismiss a habeas corpus petition if it appears from the face of the petition that the petitioner is not entitled to relief. See Lonchar v. Thomas, 517 U.S. 314, 320 (1996); Siers v. Ryan, 773

10

F.2d 37, 45 (3d Cir. 1985), cert. denied, 490 U.S. 1025 (1989).
See also 28 U.S.C. §§ 2243, 2254, 2255.

Because it appears from the Petition and its attachments that the Petition is time-barred, this Court will order Petitioner to show cause why the Petition should not be dismissed.

III.  ANALYSIS

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d),[7] which provides in pertinent part:

(1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

_____

[7] The limitations period is applied on a claim-by-claim basis.  See Fielder v. Verner, 379 F.3d 113 (3d Cir. 2004), cert. denied, 543 U.S. 1067 (2005); Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002).

11

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

Here, Petitioner alleges no facts or argument suggesting a later starting date than the date that the challenged judgment became final, under 28 U.S.C. § 2244(d)(1)(A).[8]  Thus, evaluation of the timeliness of this § 2254 petition requires determination of, first, when the pertinent judgment became "final," and, second, the period of time during which any application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.

Here, the challenged judgment became "final," and the federal habeas limitations period began to run, on January 3, 2006, ninety days after the Supreme Court of New Jersey denied certification in Petitioner's direct appeals, on October 5, 2005.

---

[8] That is, Petitioner does not allege that he was under any impediment, or that he relies upon a new and retroactive rule of constitutional law, or that the factual predicates for his claims were not known to him at the time the conviction became "final."

Thus, Petitioner had until January 3, 2007, to file his federal habeas petition, unless there were grounds for tolling.

To statutorily toll the limitations period, a state petition for post-conviction relief must be "properly filed."

> An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by the appropriate court officer for placement into the official record.  And an application is "<u>properly</u> filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings.  These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.  In some jurisdictions the filing requirements also include, for example, preconditions imposed on particular abusive filers, or on all filers generally.  But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims <u>contained in the application</u> are meritorious and free of procedural bar.

<u>Artuz v. Bennett</u>, 531 U.S. 4, 8-9 (2000) (citations and footnote omitted) (finding that a petition was not "[im]properly filed" merely because it presented claims that were procedurally barred under New York law on the grounds that they were previously determined on the merits upon an appeal from the judgment of conviction or that they could have been raised on direct appeal but were not).

Where a state court has rejected a petition for post-conviction relief as untimely, however, it was not "properly filed" and the petitioner is not entitled to statutory tolling under § 2244(d)(2).  <u>Pace v. Diguglielmo</u>, 544 U.S. 408 (2005).

This is so even where, in the alternative, the state court addresses the merits of the petition in addition to finding it untimely.  Carey v. Saffold, 536 U.S. 214, 225-26 (2002).

An application for state post-conviction relief is considered "pending" within the meaning of § 2244(d)(2), and the limitations period is statutorily tolled from the time it is "properly filed," during the period between a lower state court's decision and the filing of a notice of appeal to a higher court, Carey v. Saffold, 536 U.S. 214 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed, Swartz v. Meyers, 204 F.3d at 420-24.  More specifically, "The time that an application for state post conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." Evans v. Chavis, 546 U.S. 189, 191 (2006) (finding that time between denial of post-conviction relief and filing of appeal was not tolled where appeal was untimely, even where state considered untimely appeal on its merits).  However, "the time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244(d)(2)."  Stokes v. District Attorney of the

County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert. denied, 534 U.S. 959 (2001).

Here, Petitioner filed his first state petition for post-conviction relief three days after the conviction became "final" for federal habeas purposes.  That first PCR petition remained pending until the Supreme Court of New Jersey denied certification on May 8, 2009.  At that point, Petitioner had 362 days remaining on his federal limitations period, or until May 5, 2010, unless there were grounds for additional tolling.

Petitioner filed his second state PCR petition on June 15, 2009.  However, because the state courts determined that it was time-barred under state law, the second state PCR petition was never "properly filed" and does not satisfy the conditions for statutory tolling under § 2244(d)(2).

The limitations period of § 2244(d) also is subject to equitable tolling.  Fahy v. Horn, 240 F.3d 239, 244 (3d Cir.), cert. denied, 534 U.S. 944 (2001); Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999); Miller v. New Jersey State Dept. of Corrections, 145 F.3d 616, 618 (3d Cir. 1998).  Equitable tolling applies

> only when the principles of equity would make the rigid
> application of a limitation period unfair.  Generally,
> this will occur when the petitioner has in some
> extraordinary way been prevented from asserting his or
> her rights.  The petitioner must show that he or she
> exercised reasonable diligence in investigating and
> bringing the claims.  Mere excusable neglect is not
> sufficient.

Miller, 145 F.3d at 618-19 (citations and punctuation marks omitted).  Among other circumstances, the Court of Appeals for the Third Circuit has held that equitable tolling may be appropriate "if the plaintiff has timely asserted his rights mistakenly in the wrong forum," i.e., if a petitioner has filed a timely but unexhausted federal habeas petition.  Jones, 195 F.3d at 159.  See also Duncan v. Walker, 533 U.S. 167, 183 (2001) (Stevens, J., joined by Souter, J., concurring in part) ("neither the Court's narrow holding [that the limitations period is not statutorily tolled during the pendency of a premature federal habeas petition], nor anything in the text or legislative history of AEDPA, precludes a federal court from deeming the limitations period tolled for such a petition as a matter of equity"); 533 U.S. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.) (characterizing Justice Stevens's suggestion as "sound").

Here, Petitioner has alleged no facts that would suggest a basis for equitable tolling of the federal habeas limitations period.  Accordingly, it appears that this Petition was filed more than two years after the federal limitations period expired on May 5, 2010.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, Petitioner will be ordered to show cause why the Petition should not be dismissed as time-barred.   An appropriate order follows.

<u>s/Freda L. Wolfson        </u>
Freda L. Wolfson
United States District Judge

Dated: September 4, 2012

17